Yvonne **KELANI**, Plaintiff,

v.

Otis R. **BOWEN**, Secretary, Health and Human Services, Defendant.

No. 3–87–0275.

United States District Court,
M.D. Tennessee,
Nashville Division.

Feb. 18, 1988.

David A. Ettinger, Legal Services for Middle Tennessee, Nashville, Tenn., for plaintiff.

William Warren, III, Asst. U.S. Atty., Nashville, Tenn., for defendant.

## MEMORANDUM

MORTON, Senior District Judge.

Upon consideration of the Secretary's objections, the Report and Recommendations of the United States Magistrate is hereby adopted in full as if copied verbatim herein.

## ORDER

In accordance with the memorandum contemporaneously filed, the Secretary's motion for summary judgment is denied, the plaintiff's motion for summary judgment is granted, and this case is remanded for payment of benefits to the claimant.

## REPORT AND RECOMMENDATION

Nov. 6, 1987

WILLIAM J. HAYNES, Jr., United States Magistrate.

### I. INTRODUCTION

This civil action was filed by Yvonne Kelani on behalf of her son, Jerry Lee Davidson, pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Secretary of the Department of Health and Human Services (hereinafter the "Secretary"), that Jerry Lee Davidson is not entitled to child's survivor's insurance benefits under Section 216(h)(2)(A) of the Social Security Act (hereinafter "the Act"). This action arises from plaintiff's initial application for survivors benefits that was filed on May 20, 1985. This claim was denied initially and after reconsideration. (Transcript (tr) 138–147). Upon appeal, an evidentiary hearing was held before an Administrative Law Judge (hereinafter "ALJ") on August 18, 1986. (tr. 36–105). On November 6, 1986, the ALJ issued his findings that Jerry Lee Davidson was not the child of the deceased wage earner within the meaning of the Act and therefore, was not entitled to child insurance benefits on the earnings record of the deceased insured. On March 16, 1987, the Appeals Council (AC) refused to grant plaintiff's request for review. (tr. 3–4). This civil action was filed timely and the

District Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(e)(3). Both parties have filed cross-motions for summary judgment. On September 23, 1987, oral arguments were held on both motions.

The ALJ found that the deceased wage earner was neither living with nor contributing to Jerry Lee Davidson's support at the time of the wage earner's death. Therefore, entitlement to child insurance benefits could not be established under § 216(h)(3)(C)ii of the Social Security Act. In the ALJ's view, entitlement to child insurance benefits could only be made in this case under the Tennessee intestacy law. Under this law, clear and convincing proof must be established in order to prove paternity.

The ALJ concluded that the plaintiff had not sustained the burden of clear and convincing proof. Therefore, the ALJ concluded that Jerry Lee Davidson did not have intestate inheritance rights as the child of the deceased wage earner under the laws of the State of Tennessee and hence, he was not entitled to child insurance benefits under the Act. If supported by substantial evidence, these findings are conclusive. 42 U.S.C. § 405(g).

## II. REVIEW OF THE RECORD

Jerry Lee Davidson (hereinafter "Davidson") is the son of the plaintiff Yvonne Kelani (hereinafter "Kelani"). Davidson was born on January 3, 1969 in Nashville, Tennessee. At the time of Davidson's birth, Kelani did not indicate on the birth certificate, the name of the child's father. (tr. 111). Approximately three years after the child was born, Kelani applied for Aid to Families With Dependent Children (AFDC) at the Tennessee Department of Human Services. At that time, Kelani named Jerry Young as the child's natural father. (tr. 145, 136, and 144).

At the time of the hearing before the ALJ, Kelani was thirty-two (32) years old. Kelani testified that she had a seventh grade education. (tr. 49). Further, Kelani noted that she was never married to Mr. Claude Jett (hereinafter "Jett"), the deceased wage earner. According to Kelani's

testimony, she met Jett around the summer of 1967 when she was 13 years old. Kelani testified that she was not living with her parents because her mother had died earlier that year and the only other person that was at home was her father and herself. Because her father was an elderly gentleman, she spent the weekend, most of the time, with her girlfriend who was Barbara Gattis. Thus, during this time she was actually living with the Gattis family.

Kelani stated that she met Jett when he was employed at the neighborhood convenience store that was located directly in front of the Gattis' home where Kelani lived. Kelani stated that she and her friends frequently went into this convenience store to purchase items. Shortly after she began her trips to the store, Jett began buying small items for Kelani such as candy and potato chips. (tr. 51). Shortly thereafter, Jett began to take Kelani for rides in his car and other places. Eventually, Kelani became sexually involved with Jett. (tr. 51). Kelani testified that the Gattis family became aware of the relationship, but did not do anything to prevent her from seeing Jett.

Because Jett was married, he was very discreet and did not want others in the community and in particular his wife, to discover the relationship. (tr. 57). Nonetheless, according to Kelani, Jett did provide assistance to the Gattis' family. Kelani testified that Jett sometimes paid the utility bill and bought groceries while she lived with the Gattis family. Kelani's brother learned of her relationship with Jett and came from Chicago to take her back to reside with him. However, Kelani returned to Nashville after her brother attempted to get custody of her and was not allowed custody because her father was still living in Nashville.

Kelani testified that she became pregnant by Jett in 1968. Further, she stated there was never any doubt that Jett was the father because Kelani was never involved with anyone else other than Jett. (tr. 54–55). When Jett learned that she was pregnant, Kelani stated that he purchased maternity clothes, prescription

drugs, and also provided support for her while she lived with the Gattis family. Moreover, when her son was born in January, 1969, Jett came to the hospital to visit her and assisted her in moving to another location because at this point, Kelani was not getting along very well with the Gattis family. (tr. 55).

According to Kelani's testimony, Jett found another place for her to live with Ms. Mary Black Jackson. Jett also paid the rent for her while she lived with Ms. Mary Black Jackson. Jett purchased milk and food for their child and provided money to assist Kelani and their child in other ways.

Kelani stated that at the time she considered whether to apply for AFDC benefits, she discussed the matter with Jett who advised her not to mention his name to the officials with the Department of Human Services because he was married and he did not want his wife to discover about the birth of the child. Kelani decided to apply for benefits and named Jerry Young as the father of the child to state officials. Kelani stated she chose the name Jerry Young because it was a simple name for her because her son's name was Jerry and because she was very young at the time. (tr. 57).

Kelani testified that once she began receiving AFDC benefits, Jett was no longer available or around when she needed him. (tr. 58). According to Kelani, Jett did not visit her as he previously had. Kelani stated that her son was around two years old the last time that she saw Jett. She testified that Jett moved from Nashville and her attempts to locate him were futile. However, an unnamed source informed her that Jett had moved to Atlanta. She later learned, through a friend who worked at a nursing home, that Jett was confined at the nursing home. (tr. 59). Kelani stated that shortly thereafter she learned that Jett had died in 1983.

When she returned to become recertified for AFDC benefits sometime in 1985, her case worker noted that she had reported the death of her child's father in 1983 and again asked her about her child's father. Kelani, at that point, testified that she informed her case worker that everything that she had stated about her child's father was accurate except his name. Kelani told her case worker that Jett was the father of her son. Kelani then learned from state officials that she could apply for Social Security benefits.

Because questions were raised by state officials about Jett, Kelani contacted Jett's brother, Mr. Herman Jett. Kelani stated that Herman Jett advised her initially that he would contact Jett's other brother in Florida in order to find more information about Jett's and Kelani's relationship. (tr. 60). Later Herman Jett did not assist Kelani because he did not want to become involved. However, Kelani's son, Davidson, wrote a letter to Herman Jett in order to get a picture of Claude Jett. (tr. 61). (See also Exhibit 30). Kelani stated that her son received a response from Herman Jett's wife who stated that she would send a picture of Claude Jett to her son. Davidson received a photograph of Claude Jett. Kelani submitted the photograph at the hearing before the ALJ. (tr. 129). (See also Exhibit 11).

At the hearing before the ALJ, several witnesses testified on Kelani's behalf in support of her claim that Jett fathered her son. The first witness was Ms. Toni James (hereinafter "James"), a former case worker for the Tennessee Department of Human Services. (tr. 43–48). James testified that in May, 1985 she met Kelani when she was conducting an interview for Kelani to be recertified for benefits. At that time, James testified that she reviewed the file and noticed that it included a statement about the death of the child's father submitted in April, 1983. (tr. 43). James noted that there was no follow-up after the reported death and therefore questioned Kelani as to whether she had tried to obtain social security benefits on behalf of the child since the death of the child's father.

According to James, she explained the procedure in order for Jerry Lee Davidson to obtain benefits if he had not been legitimated. (*Id.*) After James explained to Kelani the procedure for obtaining Social

Security benefits, Kelani disclosed that everything in the record at that point was true except for the name of the child's father. According to James, it was at this point that Kelani stated that Claude B. Jett was the father of Jerry Lee Davidson and that Jerry Young was a fictitious name.

James further testified that Kelani went into great detail about why she gave a different and fictitious name to state officials. According to James, Kelani stated that her son was born in 1969 and was fathered by Jett, a white man who worked at a convenience market in her neighborhood. Kelani is black. Because the insured was a white man and was married with a family, Kelani feared problems if she told anyone the true identity of her child's natural father. Thus, in order to protect her and him, and out of fear, Kelani decided not to reveal the truth about the father of her son. Moreover, James stated that she believed Kelani. All of the other facts in Kelani's file were true except for the name of the father. (tr. 46). In James' opinion, because these events occurred in the late sixties, she believed that what happened to Kelani in fact occurred. *Id.*

Ms. Mary Black Jackson (hereinafter "Jackson")[1], also testified for Kelani. (tr. 64–67). Jackson first met Kelani when she learned that Kelani was looking for a place to live and Jackson was looking for a boarder. According to Jackson, Kelani arrived at her home with her baby and a white male. Jackson stated that Claude Jett introduced himself to her as the father of Kelani's child. Further, Jackson testified that her spouse did not want Kelani to reside with them because Claude Jett was white and her husband disliked white persons. (tr. 65). Jackson stated because they needed the money, she allowed Kelani to live with her family. Kelani resided with the Jacksons for approximately three to four months. (tr. 66). While Kelani

lived there, Jackson stated that Jett came to visit her; Jett paid all of the bills; Jett bought groceries for Kelani and her child and he also bought items for the child. (tr. 65). In addition, Jackson testified that Jett would come and take Kelani out on dates and pay her to babysit with the child. When the relationship dissolved, Jackson stated that Kelani moved. Jackson stated that this occurred around 1969. Finally, Jackson testified she had not seen Kelani since Kelani resided with her except on the date of the hearing before the ALJ. (tr. 66).

The next witness to testify was Ms. Darlene McKissock (hereinafter "McKissock"). McKissock was thirty-years old at the time of the hearing. (tr. 67). McKissock testified that she sees Kelani about once or twice every two or three years. (tr. 70). McKissock stated that Kelani was her mother's step sister. Kelani was four to five years older than McKissock. (tr. 68). As to Kelani's relationship with Claude Jett, McKissock stated that she only knew of a tall, slim, white man whom she called Claude. According to McKissock, Claude visited Kelani often and would take McKissock and Kelani for rides and would buy them personal things.

Mrs. Mary Jett, the former spouse of Claude Jett, also testified. Mary Jett testified that she married Claude Jett in September, 1972. (tr. 71). Mary Jett and Claude Jett had one daughter who was born in 1972. (tr. 72). Mary Jett was divorced from Claude Jett in April, 1977.[2] (tr. 219). Mary Jett testified that she believed that Claude Jett would have told her if he had had an illegitimate son by a fourteen year old black woman. However, Mary Jett conceded that she was pregnant while Claude Jett was married to yet another woman, Louann Jett, Claude Jett's second wife whom she believed to be his first wife.[3] Mary Jett further testified that she

---

1. At the time of the hearing, Jackson resided in Brownsville, Tennessee and traveled to Nashville for the hearing.

2. Although Mary Jett testified that she and Claude Jett were divorced in May, 1978, (tr. 72),

the divorce decree reflects that the actual date was April, 1977. (tr. 219).

3. It should be noted here that Kelani's counsel submitted a divorce complaint dated February 29, 1972, that was sworn to by Louann Jett who was Claude Jett's spouse prior to Mary Jett.

was not certain when Claude Jett began seeing Mrs. Barbara Jett who became his fourth wife. Mary Jett testified that Claude Jett hated black people and therefore, she did not believe that Claude Jett fathered Kelani's child. (tr. 89).

Ms. Thelma Estill (hereinafter "Estill") also testified regarding Claude Jett and Kelani's relationship. (tr. 91–98). Estill testified that she was employed for seventeen (17) years at the convenience market that Jett supervised. (tr. 92). Estill met Kelani when Jett introduced Kelani to her. Estill testified that Jett referred to Kelani as being his girlfriend. Estill further testified that Kelani was between the age of fourteen and fifteen years old at the time that she met her. *Id.* Estill also stated that Jett was approximately in his late thirties. *Id.*

Estill testified that Kelani came to the store approximately two or three times a day and that Jett purchased items for Kelani whenever she came to the store. Estill noted that she was aware that Jett purchased groceries and carried them to Yvonne Kelani's house. (tr. 95). Estill also testified that Jett informed her when Kelani became pregnant. *Id.* According to Estill, Jett appeared happy that Kelani was pregnant; however, Estill noted that Jett's supervisor was not pleased about the relationship and that when he discovered the relationship, Jett's employment was terminated. (tr. 96).

Estill testified that after Jett was terminated, she did not see him for approximately seven or eight years. When she later saw him, she asked him about Yvonne and the baby and he related that they were both doing fine living in North Nashville. (tr. 96). Finally, Estill testified that the last time that she had seen Kelani and her son was when Kelani's son was approximately six (6) months old. (tr. 97). Since that time Estill related that she had not seen Kelani or her son until Kelani contacted her for her testimony at the hearing before the ALJ. (tr. 97).

Louann Jett stated that Claude Jett had been married prior to their marriage. According to

## III. CONCLUSIONS OF LAW

 Judicial review of the Secretary's decision is limited to the written record made in the administrative hearing process. The determination of disability under the Act is an administrative decision, and the only question before the Court is whether the decision of the Secretary is supported by substantial evidence. Substantial evidence means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. It is more than a scintilla. *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *LeMaster v. Weinberger,* 533 F.2d 337 (6th Cir.1976). This court cannot base its decision entirely upon a single piece of evidence; the record must be evaluated as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir.1978). A reviewing court does not conduct a *de novo* examination of the evidence and it is not free to substitute its finding of fact for those of the Secretary if substantial evidence supports those findings and inferences. *Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir.1984).

The Act allows insurance benefits for both the legitimate and the illegitimate children of a fully insured deceased wage earner. 42 U.S.C. §§ 402(d)(1), 402(d)(3). However, in order to qualify for support, a child must have been "dependent" on the wage earner at the time of his death. 42 U.S.C. § 402(d)(1)(C). Legitimate children are deemed dependent under the Act. 42 U.S. C. § 402(d)(3). The Act allows an illegitimate child to be deemed the child of a wage earner by several methods. First, an illegitimate child will be deemed the legitimate child of a wage earner if the applicant could inherit the insured's personal property under the inheritance laws of the state in which the insured was domiciled at the time of the insured's death. Section 216(h)(2)(A) of the Social Security Act. 42 U.S.C. § 416(h)(2)(A). Specifically, Section 416(h)(2)(A) reads as follows:

In determining whether an applicant is the child or parent of a fully or currently insured individual for purposes of this

this document, Mary Jett could not have been Claude Jett's second wife.

subchapter, the Secretary shall apply such law as would be applied in determining the devolution of intestate personal property by the courts of the state in which such insured individual is domiciled at the time such applicant files application, or if such insured individual is dead, by the courts of the state in which he was domiciled at the time of his death, or if such insured individual is or was not so domiciled in any state, by the courts of the District of Columbia. Applicants who according to such law would have the same status relative to taking intestate personal property as a child or parent shall be deemed such.

42 U.S.C. § 416(h)(2)(A).

Second, if the applicant does not qualify under § 416(h)(2)(A), the applicant is nevertheless considered the child of such individual if the insured wage earner and the mother of the child would have been married but for a legal impediment making the marriage valid. 42 U.S.C. § 416(h)(2)(B).

Third, an applicant who has failed to qualify as a child of the insured wage earner under § 416(h)(2) may be deemed a child of the deceased wage earner pursuant to § 416(h)(3)(C) if prior to the wage earner's death, the wage earner acknowledged the child in writing, a court declared the wage earner to be the parent of the child, or a court ordered the wage earner to support the child. 42 U.S.C. § 416(h)(3)(C)(i). Finally, an applicant is the child of the wage earner if at the time of the wage earner's death, the applicant was living with or receiving support from the wage earner and the applicant presents satisfactory proof of paternity. 42 U.S.C. § 416(h)(3)(C)(ii).

Here, it is not disputed that Davidson is not the legitimate child of Jett; is not the child of a valid marriage; was not acknowledged in writing by the insured; was not determined by a court order to be the son of the insured and was not living with or receiving support from the insured at the time of his death. Hence, the only statutory basis for entitlement to child survivor's benefits is 42 U.S.C. § 416(h)(2)(A).

As mentioned previously, under this Section, "the Secretary shall apply such law as would be applied in determining the devolution of intestate property by the courts of the state in which ... the [deceased wage earner] was domiciled at the time of his death." 42 U.S.C. § 416(h)(2)(A).

There is no dispute that Claude Jett was domiciled in Tennessee at the time of his death. Therefore, the intestacy laws of Tennessee should be employed to determine whether Jerry Davidson is entitled to benefits. Section 31–2–105 of the Tennessee Code Annotated, Tennessee Intestacy Law, provides as follows:

31–2–105. Parent–Child Relationship.— If, for purposes of intestate succession a relationship of parent and child must be established to determine succession by, through, or from a person:

\* \* \* \* \* \*

Subdivision (1), a person born out of wedlock is a child of a mother. That person is also a child of the father, if:

(A) The natural parents participated in a marriage ceremony before or after the birth of the child; even though the attempt at marriage is void; or

(B) *The paternity is established by an adjudication before the death of the father or is established thereafter by clear and convincing proof,* but the paternity established under this subdivision is ineffective to qualify the father or his kindred to inherit from or through the child unless the father has openly treated the child as his or has not refused to support the child.

In *Muse v. Sluder,* 600 S.W.2d 237 (Tenn. App.1980) the Tennessee Court of Appeals opined that an illegitimate child who seeks to inherit from his putative father must establish paternity by clear and convincing evidence. However, the standard of clear and convincing evidence has not been construed as requiring written proof of paternity. In fact, in *Muse,* the Court accepted the testimony of disinterested witnesses to satisfy this burden of proof.

In *Dunn v. Heckler,* Civ. 1–83–349 (E.D. Tenn.1985), the Honorable Thomas Hull, District Judge, addressed the "clear and

convincing proof standard" under Tenn. Code Ann. § 31–2–105 in an action to obtain benefits under the Act. Judge Hull observed:

It is apparent that in the enactment of this statute providing the clear and convincing proof standard for establishing paternity following the death of the father it was intended that the proponent have a heavier burden of proof than the usual civil burden of proof, which is the greater weight or the preponderance of the evidence. *Documentary evidence in such a case would be desirable, helpful and probative. However, the statute does not require by its terms that "documentary" evidence constitute a part of the clear and convincing proof. This Court is unaware of any case law interpreting the foregoing statute which requires "documentary" evidence to be a part of the clear and convincing proof in order to establish paternity following the death of the father.*

Unempl.Ins.Rep. [CCH] 16,185, (April 28, 1985).

In this case the ALJ concluded that the most credible evidence of the paternity of Jerry Lee Davidson was Kelani's statement submitted when she applied for AFDC benefits that Jerry Young was the father. The ALJ stated:

1. Jerry Lee Davidson is not the "child" of the wage earner pursuant to section 216(h)(3)(C) of the Social Security Act as the evidence of record does not establish that the wage earner was ever decreed by a court to be his father, was ever ordered by a court to contribute to his support, or ever acknowledged him in writing. Furthermore, the evidence of record does not establish that the wage earner was his biological father or that the wage earner was either living with him or contributing to his support at the time of his death.

2. Jerry Lee Davidson is not the "child" of the wage earner under Tennessee State law as required by section 216(h)(2)(A) of the Social Security Act.

Contrary to the ALJ's finding, Kelani was not required to establish that Davidson was the child of Jett pursuant to Section 216(h)(3)(C) of the Act. Kelani's only available basis was under Section 216(h)(2)(A) of the Act. In the Magistrate's view, Kelani's witnesses and Kelani established paternity under Tennessee intestacy law.

As to Kelani's witnesses, the ALJ simply disregarded such testimony, but the ALJ did not expressly discredit this testimony. As to the need for a credibility determination by the ALJ, the Court of Appeals for this Circuit, in *Hurst v. Secretary of Health & Human Services,* 753 F.2d 517 (6th Cir.1985), explained:

While the ALJ's credibility determinations deserve great respect, no credibility has been made with regard to this evidence. As the Seventh Circuit has noted:

In the absence of an explicit and reasoned rejection of an entire line of evidence, the remaining evidence is "substantial" only when considered in isolation. It is more than merely "helpful" for the ALJ to articulate reasons ... for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review.

*Hurst v. Secretary of Health & Human Services,* 753 F.2d at 517 citing *Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir.1984).

All of Kelani's witnesses, save for Mary Jett, Claude Jett's former spouse, testified regarding their knowledge of the relationship of Kelani and Claude Jett. Of particular significance was the fact that Thelma Estill and Mary Black Jackson had not seen Kelani for more than fifteen years. Another witness was Kelani's case worker who believed that Kelani had not revealed her relationship out of fear. In addition, Mr. Luther Gordon, who worked with the insured at the service market when Jett began his relationship with Kelani, submitted a corroborative declaration that the insured acknowledged on numerous occasions that he was the father of Kelani's child.

The insured's former spouse, Mary Bates Jett, was the sole witness to testify that she believed that the insured would have

**498**

told her if he had fathered a child by a young black woman. However, Mary Bates Jett later testified that she was uncertain whether the insured would have told her and was uncertain of other relationships that Jett had with other women.

 Under Tennessee law, testimony by disinterested witnesses may establish clear and convincing proof of paternity. In this case, the Magistrate concludes that the testimony of these disinterested witnesses well satisfies the standard of clear and convincing proof that Claude Jett was the father of Jerry Lee Davidson. These witnesses had nothing to gain by confirming Jerry Lee Davidson's paternity. None of their testimony or declarations was inconsistent. Only Mary Bates Jett testified to the contrary. However, counsel for Kelani submitted a divorce decree which revealed that Louann Jett did not divorce Jett until August 16, 1972, several weeks after Mary Jett's daughter was born. Further, evidence revealed also that Mary Jett was not Jett's second wife as Jett had lead Mary Jett to believe. In the Magistrate's view, this evidence reveals Jett was not candid with Mary Jett about his personal relationship and further, that he related inaccurate information to Jett.

In the Magistrate's view, the evidence accepted by the ALJ, namely, that Jerry Lee Young was the name submitted by Kelani on her AFDC applications as Davidson's father, is a decision based entirely upon a single item of documentary evidence. Such a decision fails to evaluate the record as a whole. Moreover, there is no proof that Jerry Lee Young existed or that Kelani was involved with anyone else other than Claude Jett at the time Jerry Lee Davidson was conceived. It is interesting to note that not one witness was questioned by the ALJ as to Jerry Young's existence. Thus, the ALJ's finding is not based upon substantial evidence. Moreover, the ALJ applied an erroneous standard by stating that Kelani must submit documentary proof to establish her claim under § 416(h)(2)(A). On this record, the Magistrate concludes that the Secretary's determination was unsupported by substantial evidence.

## IV. RECOMMENDATIONS

In sum, the Magistrate recommends that the District Court grant the plaintiff's motion for summary judgment and deny the Secretary's motion because there is not substantial evidence to support the ALJ's decision. Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to this Recommendation, with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed to this Report in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).